UNITED STATES DISTRICT COURT
DISTRICT OF VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | | |
|---|---|---|
| PETER H. CHAPMAN | ) | CASE NO: |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| UNIVERSITY OF THE VIRGIN ISLANDS | ) | |
| RESEARCH AND TECHNOLOGY PARK | ) | |
| CORPORATION ("RT PARK"), | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff, Peter Chapman ("Plaintiff" or "Mr. Chapman"), by and through his undersigned counsel, as and for his Complaint in this action against Defendant the University of The Virgin Islands Research and Technology Park Corporation (RTPark), hereby alleges as follows:

## NATURE OF THE ACTION

1. This is an action for compensatory and punitive damages for violations of Plaintiff's civil rights under the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., by reason of the unlawful acts of the defendant, including but not limited to discrimination on the basis of disability, failure to provide reasonable accommodations, retaliation, and unlawful termination.

## JURISDICTION

2. This action arises under the laws of the United States, particularly the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.

3. The jurisdiction of this court is invoked under the provisions of Title 28 of the United States Code, Sections 1331 and 1343, as this case presents a federal question involving claims under federal law.

## VENUE

4. Venue of this action is proper under 28 U.S.C. §1391(b) because the events giving rise to the claims occurred within the jurisdiction of the District Court of the Virgin Islands, where the defendant conducted business and where Plaintiff was employed.

## PARTIES

5. Plaintiff **PETER H. CHAPMAN** ("Plaintiff") is an individual who resides in New York City. At all relevant times, Plaintiff was employed by the University of the Virgin Islands Research and Technology Park (RT Park) and is protected under the Americans with Disabilities Act and Title VII of the Civil Rights Act of 1964.

6. Defendant **UNIVERSITY OF THE VIRGIN ISLANDS RESEARCH AND TECHNOLOGY PARK** ("RT Park") is a public corporation and autonomous government instrumentality operating under a legislative mandate from the Government of the U.S. Virgin Islands. It operates under the auspices of the University of the Virgin Islands (UVI), with its principal place of business in the U.S. Virgin Islands. Its purpose is to promote economic development by attracting technology-based businesses and fostering innovation in the region. RT Park is an employer as defined under 42 U.S.C. §12111(5)(A) and 42 U.S.C. §2000e(b).

## INTRODUCTION

7. This is a civil rights complaint for discrimination and retaliation violating the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiff alleges that the RTPark Board of Directors, led by Edward Thomas, engaged in discriminatory and retaliatory actions due to his cancer diagnosis, request for reasonable accommodations, and filing of a Charge of Discrimination with the EEOC. These actions include the non-renewal of Plaintiff's employment Agreement and imposing a 75% cap on his performance bonus for FY2021-

22. The Plaintiff seeks equitable remedies, compensation for lost wages and benefits, and punitive damages for the unlawful conduct that caused him humiliation, emotional distress, and economic harm.

## FACTUAL ALLEGATIONS

8. The RTPark Corporation and Board of Directors entered into Agreements (Agreement) with Plaintiff effective September 1, 2018, setting forth the terms and conditions of Plaintiff's employment with the RTPark Corporation.

9. The first Agreement term was from September 1, 2018, to August 31, 2021 (FY 2018-2021). This Agreement was subsequently renewed, leading to the current Agreement term of September 1, 2021, to August 31, 2024 (FY 2021-2024).

10. Plaintiff successfully executed the terms and conditions of the FY 2018-2021 Agreement, thereby causing RTPark Corporation and the Board of Directors to renew the Agreement.

11. Plaintiff's current Agreement is effective as of September 1, 2021, and replaces the FY 2018-2021, which expired on August 31, 2021.

### Employment Terms

12. Duties and Responsibilities: Plaintiff's duties include overseeing the daily operations, implementing strategic initiatives, managing staff, and ensuring the organization meets its goals and objectives. In addition to these regular duties, Plaintiff must provide other senior executive services as reasonably requested by the President of the University and the Board of Directors of the RTPark Corporation.

13. Reporting Structure: During the term of these Agreements, Plaintiff reported directly to RTPark Corporation's Board of Directors, specifically Edward Thomas, Chairman of the Board. Plaintiff is responsible for adhering to the policies and directives of the RTPark Corporation's Board of Directors and must comply with all lawful directives issued by the Board.

14. Plaintiff is expected to devote his reasonable best efforts and attention to his duties, ensuring the efficient and effective operation of the RTPark Corporation.

15. Plaintiff, at all times, achieved the duties of the Agreements.

16. Upon information and belief, the decision to extend or renew the Plaintiff's Agreement is made by the Board of Directors of the RTPark Corporation based on their evaluation of the Executive Director's performance and other facts.

17. The Agreement is renewable by written notice to Plaintiff. This written notice must be given no later than six months before the current Agreement's expiration date of August 31, 2024, which means February 28, 2024.

18. Salary: Plaintiff's annual base salary is $170,000, payable in equal monthly installments, plus a monthly housing allowance of $5,200.

19. Performance Incentive Bonus: The Plaintiff is eligible for up to $40,000 per year based on a mutually agreed-upon performance bonus plan, subject to RTPark's financial conditions.

**Plaintiff's Performance**

20. Each of the Plaintiff's Agreements was for three-year terms.

21. Plaintiff's Agreements with RTPark span from September 1, 2018, to August 31, 2021, and were renewed for an additional term from September 1, 2021, to August 31, 2024.

22. Plaintiff's Agreement, Section 3, "Compensation," describes the CEO's "Performance Incentive Bonus Plan (Bonus Plan)." The Plan aims to align the CEO's objectives with RTPark Corporation's strategic goals, driving the executive to achieve key performance indicators for organizational success. It provides financial incentives to motivate and reward the CEO for exceeding performance expectations and meeting critical measurable objectives.

23. According to Article VI, Section 1(d)(v) and Section 1(d)(vii) of the 2014 Amended RTPark Bylaws, the Operations Committee is responsible for collaborating with the Executive Director to develop annual goals for the Park, as described in Section 3 of the Agreement. These goals are to be presented to the Board before finalization. Additionally, the Operations Committee is tasked with evaluating the performance of the Executive Director and making recommendations to the Board regarding the Executive Director's performance, including decisions related to hiring, termination, and disciplinary actions.

24. The Agreement contains specific language that indicates the performance incentive bonus plan (Bonus Plan) "may be mutually agreed and established by the RTPark Corporation

for the Executive Director (CEO)." This language clearly implies a collaborative process involving both the Board and the CEO.

25. The Operations Committee is responsible for initiating this collaboration between the CEO (Plaintiff) of RTPark and the Board of Directors to develop the Bonus plan. The Agreement does not assign the sole responsibility of developing the bonus plan to the Executive Director (CEO). Instead, the Agreement contains specific language that indicates the performance incentive bonus plan (Bonus Plan) "may be mutually agreed and established by the RTPark Corporation for the Executive Director (CEO)." This language clearly implies a collaborative process involving both the Board and the CEO.

26. Additionally, according to Article VI, Section 1(d)(v) and Section 1(d)(vii) of the 2014 Amended RTPark Bylaws, the Operations Committee, established by the RTPark Board, is responsible for collaborating with the Executive Director (CEO) to develop annual goals for the Park, which are to be presented to the Board before finalization. The Operations Committee is also tasked with evaluating the performance of the Executive Director (CEO) and making recommendations to the Board regarding the Executive Director's performance, including decisions related to hiring, termination, and disciplinary actions.

27. These sections of the Agreement and Bylaws explicitly outline the duties of the Operations Committee to work with the Executive Director (CEO) in developing goals and evaluating performance. This delegation of responsibilities implies that the Operations Committee should initiate the collaboration process to ensure that the annual goals and performance evaluations are properly conducted and presented to the Board.

28. The Board, as the CEO's supervisor, has a fiduciary duty to oversee and evaluate the CEO's performance. This includes setting clear, measurable objectives and ensuring that the criteria for performance incentives are established promptly and transparently.

29. As referenced in the University's Human Resources Policy Manual and Faculty Policy Manual, best corporate governance and executive evaluation practices highlight the importance of a structured evaluation process. This process includes setting clear objectives, receiving self-evaluations, gathering feedback, and conducting discussions. These practices underscore the necessity of Board involvement.

30. The RTPark Board of Directors initiated the development of the Bonus Plan for FY 2019 and 2020 but failed to begin this process for FY 2021-2024.

31. Even though the Board failed to initiate the bonus process for FY 2021-24, the Plaintiff's performance metrics were consistently based on the same core criteria each year: Revenue Generation, Corporate/Business Attraction, Financial Management & Compliance, Entrepreneurship, Access to Capital/The Catalyst Fund, Facilities Development/Tech Village, Facilities Improvement, and Talent Acquisition. The Plaintiff used these metrics to prepare his self-evaluation each year.

32. On or about September 1, 2021, the RTPark Board of Directors renewed the Plaintiff's FY 2019-21 Agreement.

33. The Plaintiff's renewed Agreement comprises September 1, 2021, to August 31, 2024(FY 2022-24). This Agreement is identical to the prior Agreement except for the term.

34. The Agreement was renewed because the RTPark Board, led by Edward Thomas, was satisfied with Plaintiff's performance due to his accomplishments and achievement of the bonus plan criteria, as presented in Plaintiff's self-evaluation demonstrating his fulfillment of the performance metrics according to the Agreement for September 1, 2018, to August 31, 2021 (FY 2019-21).

**Violations of the Americans with Disabilities Act**

35. On January 3, 2024, by email, Plaintiff informed Edward Thomas, Chairman of the Board at UVI Research & Technology Park Corporation (RTPark), via email of his recent cancer diagnosis. The plaintiff copied Khyra Thomas, contracted Human Resources liaison (RTPark), on the email communication and Mr. Thomas's Chief of Staff, Aminah Saleem.

36. In the email communication, Plaintiff explicitly stated to Mr. Thomas and Khyra Thomas his need for accommodations to attend medical appointments in New York, NY, and Baltimore, MD, for oncological treatment.

37. Plaintiff reported his cancer diagnosis on January 3, 2024, began treatment in March 2024, and expects to continue periodic treatment through September 3, 2024.

38. On February 5, 2024, Mr. Thomas replied via email, indicating that he had met with other board members to discuss Plaintiff's "health challenges, and how [they] would move forward with the business of the Park."

39. The Plaintiff disapproved of Mr. Thomas's discussing his health condition with staff, and Mr. Thomas never requested such permission.

40. In the same email on February 5, 2024, Mr. Thomas indicated his intention to meet with Plaintiff and Plaintiff's staff on February 16, 2024, to "disclose" Plaintiff's medical issue and discuss contingency plans involving Plaintiff's executive team during Plaintiff's absence.

41. Mr. Thomas either perceived that Plaintiff was disabled or that the cancer diagnosis disabled him.

42. Plaintiff did not authorize Mr. Thomas to discuss his health condition at this proposed February 16, 2024 meeting, and Mr. Thomas never requested such permission.

43. At no time following Plaintiff's request for a reasonable accommodation did Mr. Thomas or Khyra Thomas (HR) engage in an interactive dialogue with Plaintiff to understand the nature of the disability and the specific accommodations requested.

44. Even though Plaintiff requested a reasonable accommodation and informed Mr. Thomas and Khyra Thomas (HR), specifically, that he would likely need to be away from the territory for extended periods to attend medical appointments in New York City and Maryland, they both ignored Plaintiff's request.

45. On February 5, 2024, upon receiving Mr. Thomas's email, Plaintiff promptly notified Khyra Thomas (HR) of the impending disclosure of his cancer diagnosis to Plaintiff's staff without Plaintiff's consent.

46. Upon information and belief, Khyra Thomas (HR) was aware of the Plaintiff's HIPAA rights. She did not advise Plaintiff or Mr. Thomas of these rights or prevent Mr. Thomas from disclosing Plaintiff's confidential information.

47. On February 15, 2024, Plaintiff sent a follow-up email to Mr. Thomas reiterating his strong desire to maintain the confidentiality of his cancer diagnosis, specifically citing his protections under federal law.

48. Mr. Thomas did not respond to Plaintiff's February 15 email request not to disclose his cancer diagnosis to Plainiff's general staff.

49. However, on February 15, Mr. Thomas traveled from St. Thomas to St. Croix to meet with the Plaintiff and two members of the Plaintiff's executive team (Eric Sonnier, Director of Entrepreneurship, and Aminah Saleem, Chief of Staff) to discuss "plans" for the next day's plenary meeting with the broader RTPark team.

50. On February 15, during this meeting, Plaintiff verbally reiterated his objection to Mr. Thomas concerning sharing details regarding his cancer diagnosis or medical condition with the general staff at the February 16 meeting.

51. On February 16, 2024, in an unprecedented act, Mr. Thomas convened a meeting with the entire RTPark staff, approximately 17 in attendance, where he referenced the RTPark bylaws concerning the Plaintiff's role as the Executive Director (now CEO) and the Board's responsibilities, including the renewal clause of the Plaintiff's Agreement, which Mr. Thomas disclosed would expire on August 31, 2024.

52. Despite Plaintiff's objections and without Plaintiff's consent, Mr. Thomas alluded to Plaintiff's medical issue during the meeting, attempting to coerce Plaintiff into disclosing his cancer diagnosis to staff members present.

53. Khyra Thomas (HR) was present during this meeting but did not take action to address Mr. Thomas's inappropriate actions or comments regarding the Plaintiff's medical condition.

## Retaliation Under The Americans With Disability Act

54. On February 26, 2024, shortly after the February 16, 2024, meeting, Plaintiff received an email from the RTPark Board of Directors, notifying Plaintiff of their decision not to renew Plaintiff's Agreement.

55. As stated above, on January 3, 2024, Plaintiff reported his cancer diagnosis and a request for a reasonable accommodation to Mr. Thomas. Fifty-five days later, on February 26, 2024, the RTPark Board of Directors, led by Mr. Thomas, notified Plaintiff that his FY 2022-24 Agreement would not be renewed.

56. Neither the RTPark Board of Directors nor Mr. Thomas articulated any legitimate reason, such as poor performance, for not renewing Plaintiff's Agreement before or after Plaintiff disclosed his cancer diagnosis.

57. Upon information and belief, the Board had no legitimate reason for not renewing Plaintiff's FY 2022-24 Agreement other than Plaintiff's cancer diagnosis and request for a reasonable accommodation.

58. RTPark Board of Directors, led by Mr. Thomas, did not renew the FY 2022-24 Agreement because Plaintiff reported his cancer diagnosis to Mr. Thomas and requested reasonable accommodation.

59. In violation of the Americans with Disabilities Act (ADA), codified at 42 U.S.C. § 12101 et seq., and under the retaliation provision at 42 U.S.C. § 12203(a), the RTPark Board of Directors, led by Mr. Thomas, retaliated against Plaintiff by not renewing the FY 2022-24 Agreement because Plaintiff reported his cancer diagnosis to Mr. Thomas and requested reasonable accommodation.

60. On May 10, 2024, the Plaintiff filed a Charge of Discrimination alleging discrimination under the Americans with Disabilities Act (ADA).

61. Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3(a)) prohibits employers from retaliating against employees who file a charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC).

62. In another retaliatory act, on June 13, 2024, a special committee appointed by Mr. Thomas, RTPark Board Chairman, consisting of board members Ian Tomlinson, Dr. David Hall, and William DeLone, unfavorably decided the Plaintiff's bonus for FY 2021 and 2022.

63. And, in yet another retaliatory act, the defendant, led by the same special committee appointed by Mr. Thomas, further retaliated against Plaintiff because Plaintiff reported his cancer diagnosis and requested a reasonable accommodation to facilitate his treatment, as discussed above.

64. The RTPark, led by Mr. Thomas, did not create a bonus plan for FY 2021-22. The relevant section in Plaintiff's Agreement requires the Performance Incentive Bonus to be awarded "pursuant to a performance bonus plan" that was "mutually agreed and established by the RTPark Corporation." For FY 2021-22, no plan was developed or agreed upon.

65. Plaintiff received 100% of the maximum bonus for FY2019 and 91.25% of the maximum bonus for FY2020. Both bonuses were awarded based on a bonus plan that remained identical for FY2019-20.

66. Nevertheless, on May 1, 2023, the Plaintiff provided the RTPark Board with his FY 2021-22 self-evaluation.

67. On June 13, 2024, the RTPark Board, led by Mr. Thomas, issued their bonus determination for FY 2021-22, one month and five days after the Plaintiff filed a Charge of Discrimination with the EEOC.

68. On June 13, 2024, the RTPark Board, led by Mr. Thomas, issued their bonus determination for Plaintiff's FY 2021-22 performance, one year and a month after receiving Plaintiff's self-evaluation.

69. The RTPark Board, led by Mr. Thomas, issued Plaintiff's bonus determination late and without a reasonable explanation.

70. This text of the June 13, 2024 bonus letter, written by Dr. Hall, Mr. Tomlinson, and Dr. Delone, explains that for FY2021 and FY2022, no mutually agreed-upon and established bonus plan was in place as required by the contract. As a result, the board recommended capping Plaintiff's bonus to 75% of the maximum bonus for both years.

71. The RTPark Board, led by Mr. Thomas, penalized Plaintiff because no bonus plan was in place for FY2021-22.

72. Since the board is responsible for establishing the bonus plan, penalizing Plaintiff for the absence of such a plan is a pretext for ADA discrimination and retaliation because the board did not fulfill its obligation to develop it.

73. In the June 13, 2024 letter text, the RTPark Board, led by Mr. Thomas, did not indicate the specific bonus calculation for FY2021 and FY2022. Instead, he wrote that the board recommended awarding 75% of the maximum bonus for both years.

74. In the June 13, 2024 letter text, the RTPark Board, led by Mr. Thomas, did not indicate the method for calculating and deciding the 25% penalty for the Plaintiff's alleged failure to establish a bonus plan. Thus, the 25% penalty was arbitrary and a pretext for discrimination and retaliation.

75. In the June 13, 2024 letter, the RTPark Board, led by Mr. Thomas, acknowledged that many of Plaintiff's achievements in FY2021 and FY2022, as detailed in his self-evaluation, were similar to the goals outlined in the previous years' bonus plans, precisely the FY2019-20 bonus plan

76. In the June 13, 2024 letter, the RTPark Board, led by Mr. Thomas, acknowledged the accomplishments achieved by Plaintiff and detailed in his FY2021 and FY2022 self-evaluation.

77. As outlined in Plaintiff's self-evaluation, absent retaliation by the RTPark Board, led by Mr. Thomas, Plaintiff would have received similar bonus calculations to FY 2019-20, 100% and 91.25%, respectively.

**FY2021 Self Evaluation**

78. In FY2021, the Plaintiff, the RTPark Chief Executive Officer, led the organization through significant challenges presented by the COVID-19 pandemic, successfully maintaining operational and programmatic excellence.

79. Despite the pandemic, Plaintiff oversaw a 7% increase in revenue compared to the previous fiscal year, totaling $7.502 million, which included $2.051 million in financial support for the University of the Virgin Islands.

80. Under his leadership, the RTPark attracted 17 new companies, with seven fully activated, bringing the total number of affiliated companies to a record 73, up from 30 when he arrived in September 2018.

81. The Plaintiff also advanced entrepreneurship through the Accelerate VI program, graduating another cohort of seven startups, bringing the total to 21 startups over three years. These startups collectively raised $3.5 million in capital and increased their revenue by $1 million over the last two years. Notably, Thomas Fields, a member of the 2019 cohort, was featured on "Shark Tank" and named a Forbes '30 under 30' honoree, showcasing the program's impact.

82. Additionally, the Plaintiff secured $5 million in capitalization for the Catalyst Fund to support job creation and capital investment in the Virgin Islands.

83. Regarding financial management and compliance, RTPark completed audits for fiscal years 2017 and 2018, including a restatement of FY2016, and was in the process of completing audits for fiscal years 2019 and 2020.

84. Moreover, RTPark achieved significant milestones in facilities development, successfully opening new headquarters and coworking spaces despite the global pandemic.

85. In talent development, the Plaintiff launched the VI STEM Kids initiative, which introduced coding to youth with the support of donated Chromebooks and achieved a 100% completion rate of the curriculum by participating students.

86. In recognition of these and other accomplishments under the Plaintiff's leadership, the RTPark was designated Economic Development Organization of the Year by the nation's leading economic development trade and policy group, the Washington, DC-based International Economic Development Council (IEDC), in October 2020. This marked the first time the RTPark had received such an important distinction.

**FY2022 Self-Evaluation**

87. FY2022 was another record-breaking year in revenue generation, with revenues reaching $10.5 million, representing a 37% increase over FY2021 and a nearly 240% increase since Plaintiff's arrival in 2018. This included a significant $2.1 million windfall fee from Exigo, achieved by negotiating the removal of the PTA cap. This success led to a $3 million net profit for the year, boosting reserves to $3.4 million. Even without the Exigo windfall, RTPark would have achieved a net profit of nearly $1 million.

88. Additionally, RTPark diversified revenue streams, generating $6.75 million from special purpose and competitive federal and GVI grants for various initiatives, including the Catalyst Fund, VISTA+, Accelerator, and solar infrastructure for 64 West.

89. This consistent revenue growth allowed RTPark to eliminate over $4 million in debt since 2018. Moreover, RTPark generated approximately $2.5 million for UVI, marking a nearly 250% increase in financial support to the university from RTPark's operations since 2018.

90. In Corporate/Business Attraction, RTPark activated or activated twelve new enterprises, bringing the total to 82 "traditional" or "mature" companies in RTPark's portfolio, a 267% increase since October 2018.

91. RTPark also made significant progress in attracting high-quality companies capable of creating or facilitating access to quality jobs for Virgin Islanders. Notable examples include MI USVI, a medical informatics and coding company from Arkansas; NTest, a fiber-optics firm from Minnesota; and Strongkor, a green-build technology company from Canada.

92. In Financial Management & Compliance, RTPark's ongoing efforts to address legacy financial management and compliance issues, the RTPark compliance team identified $1.7 million in funds owed to RTPark and collected approximately $1.3 million.

93. RTPark also implemented new compliance processes and a secure portal system for uploading required financial information from client companies. The IRS investigation into a former RTPark client underscored the importance of these measures and highlighted the perils of the old RTPark model, which lacked robust compliance monitoring systems.

94. In Entrepreneurship, RTPark completed the second cohort of the Pre-Accelerate VI program, supporting Virgin Islanders in the early stages of developing their tech businesses. This year's cohort served five local startups, and the participants completed

pitch-deck presentations that are now used to promote RTPark's efforts in strengthening local tech entrepreneurship.

95. RTPark received a $5 million investment for the Catalyst Fund through Act 8464, signed into law by Governor Bryan. The Loan Review Committee, which includes an RTPark board member, approved loans totaling $2.5 million to two RTPark companies in the ag-tech space. RTPark has also built a pipeline of prospective borrowers and anticipates making additional loans in the coming months.

96. Facilities Development/Tech Village: The intensive community education and legislative advocacy efforts resulted in the VI Legislature's final approval of a 26-acre site for the Tech Village project. RTPark also received authorization to re-zone key parcels to allow for new construction.

97. Regarding Facilities Improvement, RTPark successfully moved into the newly renovated headquarters at 64 West Palm Drive on the UVI St. Croix campus during the previous fiscal year. To enhance energy efficiency and reduce annual WAPA expenses, RTPark secured a $1.1 million FEMA grant. This investment is expected to position RTPark as a credible agent of change in harnessing alternative energy.

98. Regarding Talent Acquisition, RTPark received a $600,000 grant from the VI Department of Labor to support our VISTA+ talent acquisition platform. This initiative has attracted over 3,000 unique site visits and posted 30 jobs as of October 26th.

99. Overall, FY2021 and FY2022 marked the most vital consecutive years in RTPark's history, particularly in revenue generation and the expansion of the business attraction portfolio

100.    Plaintiff alleges that, but for the RTPark Board led by Mr. Thomas, retaliation and discriminatory acts, given the significant achievements led by Plaintiff during FY2021 despite the challenges presented by the COVID-19 pandemic, including substantial revenue growth, successful business attraction, and notable advances in entrepreneurship, it would be reasonable that Plaintiff would have received a recommendation of at least 91.25% of the maximum bonus, similar to the FY2020 performance before any deductions.

101.    Plaintiff alleges that, but for the RTPark Board, led by Mr. Thomas, retaliation and discriminatory acts, given RTPark's significant achievements, led by Plaintiff, during FY2022, including record-breaking revenue, significant debt elimination, and substantial grant funding, a recommendation close to or at 100% of the maximum bonus would be

justified based on the self-evaluation and comparisons with previous years' performances, and similar to FY20 performance.

## FIRST CAUSE OF ACTION

### Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*
### Title II, 42 U.S.C. § 12131(1)
### 42 U.S.C. § 12102(2)(C)
### (Regarded As Disabled)
### (Contract Renewal)

102.     Defendant, RTPark Board of Directors, led by Edward Thomas, Chairman of the Board, perceived Plaintiff as having a disability as defined under the ADA.

103.     On January 3, 2024, Plaintiff informed Edward Thomas by email, Chairman of the RTPark Board, and Khyra Thomas, HR, of his cancer diagnosis and his need for accommodations to attend medical appointments for oncological treatment.

104.     On January 3, 2024, Plaintiff, in the same email to Mr.Thomas, explicitly stated that he did not expect his cancer diagnosis to impair his work performance. In the letter, Plaintiff assured Mr. Thomas: "Of course, I will remain plugged in virtually whenever feasible. I do not expect my condition to affect my work performance, as I remain as physically strong and intellectually engaged as I ever have. However, I recognize that having this diagnosis is a major thing nonetheless, and I must seek the necessary medical care to eradicate the cancer."

105.     Plaintiff's periodic treatments would only temporarily interrupt his schedule over six months or more, which encouraged Plaintiff to request a reasonable accommodation, which Mr. Thomas ignored. Ms.  Khyra Thomas (HR) also took no action.

106.     The Plaintiff alleges that the RTPark Board, led by Mr. Thomas, the Chairman, perceived the Plaintiff as having a physical or mental impairment that substantially limited his work performance in his role as CEO of RTPark.

107.     This perception was evidenced by Mr. Thomas's actions and communications, which indicated that the Plaintiff's cancer diagnosis was seen as significantly restricting his ability to perform essential job functions and manage daily activities.

108.     On February 5, 2024, Mr. Thomas replied via email to Plaintiff's January 3, 2024 email, indicating he had met with other board members to discuss Plaintiff's "health

challenges and how [they] would move forward with the business of the Park," implying a perception that Plaintiff's condition would substantially limit his work performance.

109.    On February 5, 2024, Mr. Thomas indicated in his email his intention to meet with Plaintiff and Plaintiff's staff on February 16, 2024, to "disclose" Plaintiff's medical issue (against Plaintiff's admonishments) and discuss contingency plans during Plaintiff's absence, demonstrating a belief that Plaintiff's condition necessitated significant adjustments and contingency planning, thus indicating a perception of substantial limitation.

110.    On February 5, 2024, upon receiving Mr. Thomas's email, Plaintiff promptly notified Khyra Thomas (HR) of the impending disclosure of his cancer diagnosis to Plaintiff's staff without Plaintiff's consent. This action further points out the Plaintiff's concern about the unauthorized and unnecessary disclosure of his medical information.

111.    On February 15, 2024, Plaintiff sent a follow-up email to Mr. Thomas reiterating his strong desire to maintain the confidentiality of his cancer diagnosis, specifically citing his protections under federal law and the unnecessary need for such disclosure.

112.    Nevertheless, on February 15, 2024, Mr. Thomas traveled from St. Thomas to St. Croix to meet with Plaintiff and members of his executive team to discuss "plans" for the next day's plenary meeting with the broader RTPark team, suggesting a perception that Plaintiff's condition substantially limited his ability to continue performing his role.

113.    On February 15, 2024, during a meeting with Mr. Thomas and two members of Plaintiff's executive team, Plaintiff verbally reiterated his objection to Mr. Thomas concerning sharing details regarding his cancer diagnosis or medical condition with the general staff at the February 16 meeting, reiterating his persistent concern about maintaining his privacy regarding his medical condition and the unnecessary need for such disclosure.

114.    On February 16, 2024, Mr. Thomas convened a meeting with the entire RTPark staff, during which he alluded to Plaintiff's medical issue and attempted to coerce Plaintiff into disclosing his cancer diagnosis to staff members present, indicating a belief that Plaintiff's condition substantially limited his work performance.

115.    On February 26, 2024, The RTPark Board of Directors, led by Mr. Thomas, notified Plaintiff of their decision not to renew Plaintiff's Agreement 55 days after learning of the

cancer diagnosis. The swift decision to not renew Plaintiff's Agreement following the disclosure of his diagnosis suggests that the Board, led by Mr. Thomas, perceived Plaintiff's cancer as a substantial limitation affecting his ability to perform his role.

116.     These actions by Mr. Thomas demonstrate a perception by Mr. Thomas that Plaintiff's cancer diagnosis significantly restricted Plaintiff's ability to perform essential job functions and manage daily activities, contrary to Plaintiff's clear statements that his condition would not impair his overall work performance related to the obligations of his Agreement.

117.     On February 26, 2024, the RTPark Board, led by Mr. Thomas, notified Plaintiff of their decision not to renew Plaintiff's Agreement, constituting an adverse employment action.

118.     The adverse action of not renewing Plaintiff's Agreement came shortly after Plaintiff disclosed his cancer diagnosis, requested accommodations, and met with Plaintiff's staff, suggesting a causal connection with the adverse action.

119.     The timing of the decision (55 days after Plaintiff's disclosure) and the lack of legitimate reasons for non-renewal before or after the diagnosis further indicate that the decision was due to Plaintiff's perceived impairment.

120.     As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights and sensibilities, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, and other consequential damages.

121.     Plaintiff seeks equitable remedies, including compensation for lost wages (back pay and front pay), benefits, and other financial losses resulting from the unlawful non-renewal of the Agreement. The Plaintiff also seeks attorney's fees and court costs.

122.     Defendant's unlawful conduct constitutes a willful and wanton violation of the ADA, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### SECOND CAUSE OF ACTION

**Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq***
**Title II, 42 U.S.C. § 12131(1)**
**42 U.S.C. § 12102(2)(C)**

**(Regarded As Disabled)**

**(Bonus Penalty)**

123.    Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

124.    In addition to failing to renew Plaintiff's Agreement, the RTPark Board, led by Mr. Thomas, issued a 75% cap on Plaintiff's performance bonus for FY2021-22, despite significant achievements, another adverse action tied to Plaintiff's perceived impairment.

125.    Defendant imposed this cap as a penalty on Plaintiff's bonus for FY2021-22, claiming Plaintiff did not provide the RTPark Board with a bonus plan to guide their bonus evaluation process.

126.    RTPark's reason for capping Plaintiff's FY21-22 bonus at 75% was a pretext for discrimination because the Board failed to establish the required mutually agreed-upon bonus plan, which was their responsibility, and penalized Plaintiff despite his significant achievements, as fully set forth herein.

127.    The Plaintiff alleged in the foregoing paragraphs that the defendant's stated justification was a pretext for the actual reason: the defendant regarded the Plaintiff as disabled and perceived the Plaintiff's cancer as a substantial limitation affecting his ability to perform his role at 100%.

128.    As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights and sensibilities, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, and other consequential damages.

129.    The Plaintiff seeks equitable remedies, including 100% of the FY 2021-22 bonus. The Plaintiff also seeks attorney's fees and court costs.

130.    Defendant's unlawful conduct constitutes a willful and wanton violation of the ADA, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**THIRD CAUSE OF ACTION**

**Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq***
**Title II, 42 U.S.C. § 12131(1)**
**42 U.S.C. §12203(a)**
**(Retaliation)**

**(Contract Renewal)**

131.     Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

132.     The defendant has violated the Americans with Disabilities Act (ADA) by subjecting Plaintiff to retaliation for his protected activity of disclosing his cancer diagnosis and requesting reasonable accommodations by, among other things, deciding not to renew Plaintiff's Agreement.

133.     On January 3, 2024, Plaintiff informed Edward Thomas, Chairman of the Board at UVI Research & Technology Park Corporation (RTPark), via email of his recent cancer diagnosis.

134.     The plaintiff explicitly stated his need for accommodations to attend medical appointments for oncological treatment.

135.     Despite this, on February 26, 2024, fifty-five days after Plaintiff disclosed his diagnosis and requested accommodations, the RTPark Board of Directors, led by Mr. Thomas, notified Plaintiff of their decision not to renew his Agreement.

136.     As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights and sensibilities, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, and other consequential damages.

137.     Plaintiff seeks equitable remedies, including compensation for lost wages (back pay and front pay), benefits, and other financial losses resulting from the unlawful non-renewal of the Agreement. The Plaintiff also seeks attorney's fees and court costs.

138.     Defendant's unlawful retaliatory conduct constitutes a willful and wanton violation of the retaliation laws, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**FOURTH CAUSE OF ACTION**

**Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq***
**Title II, 42 U.S.C. § 12131(1)**
**42 U.S.C. §12203(a)**
**(Retaliation)**
**(Bonus Penalty)**

139.     Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

140.     The defendant has violated the Americans with Disabilities Act (ADA) by subjecting the Plaintiff to retaliation for his protected activity of disclosing his cancer diagnosis and requesting reasonable accommodations. For example, the defendant issued a 75% cap on the Plaintiff's performance bonus for FY2021-22.

141.     The defendant ignored the plaintiff's accommodation request.

142.     On January 3, 2024, Plaintiff informed Edward Thomas, Chairman of the Board at UVI Research & Technology Park Corporation (RTPark), via email of his recent cancer diagnosis and explicitly stated his need for accommodations to attend medical appointments for oncological treatment.

143.     Despite this disclosure, on June 13, 2024, the RTPark Board, led by Mr. Thomas, issued their bonus determination for FY2021-22, capping Plaintiff's bonus at 75%.

144.     Defendant imposed this cap as a penalty on Plaintiff's bonus for FY2021-22, claiming Plaintiff did not provide the RTPark Board with a bonus plan to guide their bonus evaluation process.

145.     RTPark's reason for capping Plaintiff's FY21-22 bonus at 75% was a pretext for discrimination because the Board failed to establish the required mutually agreed-upon bonus plan, which was their responsibility, and penalized Plaintiff despite his significant achievements, as fully set forth herein.

146.     The Plaintiff alleged in the foregoing paragraphs that the defendant's stated justification was a pretext for the actual reason: Plaintiff informed RTPark of his cancer diagnosis and requested a reasonable accommodation, which the defendant ignored since the defendant regarded the Plaintiff as disabled and perceived the Plaintiff's cancer as a substantial limitation affecting his ability to perform his role at 100%.

147.     As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights and sensibilities, Plaintiff has suffered humiliation, degradation, emotional distress, lost wages, and other consequential damages.

148.     The Plaintiff seeks equitable remedies, including 100% of the bonus. The Plaintiff also seeks attorney's fees and court costs.

149.    Defendant's unlawful retaliatory conduct constitutes a willful and wanton violation of the ADA, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**FIFTH CAUSE OF ACTION**

**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e**
**42 U.S.C. §12203(a)**
**(Retaliation)**
**(Bonus Penalty)**

150.    Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

151.    On May 10, 2024, the Plaintiff filed a Charge of Discrimination alleging discrimination under the Americans with Disabilities Act (ADA).

152.    Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-3(a)) prohibits employers from retaliating against employees who file a charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC).

153.    The RTPark, led by Mr. Thomas, did not create a bonus plan for FY 2021-22. The relevant section in Plaintiff's Agreement requires the Performance Incentive Bonus to be awarded "pursuant to a performance bonus plan" that was "mutually agreed and established by the RTPark Corporation." For FY 2021-22, no plan was developed or agreed upon.

154.    In another retaliatory act, on June 13, 2024, a special committee appointed by Mr. Thomas, RTPark Board, consisting of board members Ian Tomlinson, Dr. David Hall, and William DeLone, unfavorably decided the Plaintiff's bonus for FY 2021 and 2022.

155.    In the June 13, 2024, bonus letter, the RTPark Board, led by Mr. Thomas, did not indicate the specific bonus calculation for FY2021 and FY2022. Instead, he wrote that the board recommended awarding 75% of the maximum bonus for both years.

156.    In the June 13, 2024, bonus letter, the RTPark Board, led by Mr. Thomas, did not indicate the method for calculating and deciding the 25% penalty for the Plaintiff's alleged failure to establish a bonus plan. Thus, the 25% penalty was arbitrary and a pretext for discrimination and retaliation.

157.    The lack of specificity and transparency suggests that the decision was not based on objective performance metrics and was influenced by Plaintiff's EEOC filing, suggesting a pretext for retaliation.

158.    The RTPark Board, led by Mr. Thomas, penalized Plaintiff because no bonus plan was in place for FY2021-22.

159.    Since the board is responsible for establishing the bonus plan, penalizing Plaintiff for the absence of such a plan is a pretext for retaliation because the board did not fulfill its obligation to develop it.

160.    On June 13, 2024, the RTPark Board, led by Mr. Thomas, issued Plaintiff an adverse bonus determination for FY 2021-22, one month and five days after Plaintiff filed a Charge of Discrimination with the EEOC. The timing of this adverse action suggests that it was retaliatory, taken in response to Plaintiff's protected activity of filing the EEOC charge, thereby establishing a causal connection between the protected activity and the adverse action.

161.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the 42 U.S.C. § 2000e-3(a), Plaintiff has suffered and continues to suffer monetary and/or economic damages as well as severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

162.    The Plaintiff seeks equitable remedies, including 100% of the bonus. The Plaintiff also seeks attorney's fees and court costs.

163.    Defendant's unlawful retaliatory conduct constitutes a willful and wanton violation of the 42 U.S.C. § 2000e-3(a), was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**WHEREFORE**, Plaintiff, PETER H. CHAPMAN, requests that this Court:

1. Accept jurisdiction over the parties;
2. Empanel and charge a jury with respect to this action;

3. Order Defendant to make Plaintiff, PETER H. CHAPMAN, whole from the acts described above by providing compensation in amounts to be determined at trial, including but not limited to back pay, front pay, lost benefits, and other pecuniary losses;

4. Order Defendant to provide Plaintiff, PETER H. CHAPMAN, compensatory damages with pre and post-judgment interest, punitive damages, and compensate Plaintiff for nonpecuniary losses, including emotional distress, pain, suffering, humiliation, and reputational harm, in amounts to be determined at trial for the injuries suffered as a result of Defendant's unlawful conduct;

5. Order Defendant to pay reasonable attorney's fees, litigation expenses, and other costs incurred by Plaintiff as provided by the applicable federal statutes, including the Americans with Disabilities Act (ADA) and Title VII of the Civil Rights Act of 1964;

6. Award Plaintiff, PETER H. CHAPMAN, any other relief deemed necessary, just, and proper by this Court.

**DEMAND FOR JURY TRIAL**

The Plaintiff demands a trial by jury as to all issues.


RESPECTFULLY SUBMITTED,
On this 3rd day of April 2025

BY: _/s/ Scot McChain_
Scot F. McChain, Esq.
MCCHAIN HAMM & ASSOCIATES
5030 Anchor Way, Suite 13
Christiansted, VI 00820
Tel: (340) 773-6955
info@usvi.law
smcchain@usvi.law